First case this morning, Continental Tire North America v. The Workers' Compensation Commission, 5080590. Counsel, please. May it please the Court, Mr. Knepper. My name is Cheryl Lynch-Biott. I'm here on behalf of Continental Tire North America. This case involved three applications for benefits that were filed by Mr. Rexing against Continental Tire, and those applications were consolidated for hearing and tried in front of Arbitrator Tobin on October 20, 2006, at which time the arbitrator found that Mr. Rexing's condition of well-being, which was bilateral epicondylitis, was due to his employment at Continental Tire. The issues on appeal before this Court are whether the Commission's affirmation of that finding of a work-related accident is against the manifest weight of the evidence, as well as the award of medical expenses and TTD benefits and mileage. Mr. Rexing's condition for all three of his claims is bilateral epicondylitis. This Court is charged with reviewing the Commission's decision to determine if it is supported by substantial evidence. If it's not supported by substantial evidence, it's against the manifest weight and must be vacated. A case is also against the manifest weight of the evidence when an opposite conclusion is clearly evident or when the findings appear to be unreasonable, arbitrary, or not based on the evidence. In this case, all four of those standards are applicable. The Commission's finding that the epicondylitis was due to his employment at Continental Tire is against the manifest weight of the evidence. Mr. Rexing began working at Continental Tire 14 years before the arbitration hearings and his job was as an apex operator. But in addition to the job at Continental Tire, Mr. Rexing operated a pumpkin farm. His dates of injury were December 30, 2002, July 16, 2004, and May 5, 2005. When he started the pumpkin patch in 2000, it started as a quarter of an acre. In 2001, it was two acres and in 2002, it was up to 10 acres. 2002 was the year of his first claimed injury. The pumpkin farm continued to grow and by 2003, it was 20 acres and remained at that same level until 2006 when it was reduced to 15 acres. The article that is referenced in the newspaper article by Mr. Norfleet that's also in the record indicated that in addition to the 20 acres of pumpkin farming, there was an additional 100 acres of other farm area that was used for planting gourds and other plants. And this was in the newspaper article that was published in 2004. Dr. Nadalski was of the opinion, as you referenced, that the claimant's condition was caused by the pumpkin farming. Dr. Bainey believed that the claimant's work as the apex operator was the cause of his condition. Why wouldn't it be up to the Commission to weigh the conflicting testimony and the credibility and believability of the witnesses? Because in this case, Dr. Bainey's opinion was based on the fact that it was his belief that Mr. Rexing's operation of the pumpkin farm consisted of no more than 23 days of the year. He believed it was one day to plant the pumpkins, one day to till the farm, and three weeks to harvest the pumpkins. The evidence in this record clearly establishes that this pumpkin venture was more than 23 days. In fact, the pumpkin farm would begin in mid-May and go all the way until the end of October. And up until 2003, well, before 2003, all of this planting, tilling, hoeing, weeding was done by hand on a 20-acre pumpkin farm. That's not going to take 23 days. This obviously was a procedure that took a great amount of time and effort by Mr. Rexing. And that is noted in the newspaper article that was published in 2004. So it's not so much an issue of, if we didn't have facts that Dr. Bainey was unaware of or misinformed of, because his information regarding the pumpkin farm came from Mr. Rexing and we were dealing with everybody on the same playing field, that would be fine. But what's also interesting to note with regard to Dr. Bainey's opinion is that he specifically stated in his testimony that if it were determined that Mr. Rexing's participation in the pumpkin farm was more significant than what had been relayed to him during his treatment of Mr. Rexing, then his opinion would change. So the commission basically took Dr. Bainey's opinion that said, I think it was the apex operator, failed to take into consideration the fact that Dr. Bainey specifically stated that if it was more than just 23 days, his opinion would change, and didn't look at all of the other evidence in the record, which included three of his employees, a newspaper article, the treating doctor, Dr. Onn, who originally believed it was from his job as an apex operator. And it isn't until Mr. Rexing comes back from Dr. Nagolsky's exam and then he finds out about the pumpkin patch, he specifically asks Mr. Rexing about this issue, asks him to send him a copy of the newspaper article. And he also asks him to confirm that his condition arose before the pumpkin patch began. And when he reviews the article and sees that the condition arose after, not before, like Dr. Onn thought, he specifically says, this isn't work-related. His own treating physician said, it's not work-related. I'm not going to do the surgery under workers' comp. If you want to get the surgery done here, you're going to have to do it under your group health. That's when Mr. Rexing suddenly starts treating with Dr. Beatty. So, you know, it's not so much an issue as whether the commission could make a causation finding based on one physician's opinion over another. In this case, the commission ignored every piece of evidence that clearly indicated Dr. Beatty was misinformed about the amount of time that was spent at the pumpkin farm, and all of the testimony from all of the employees and the newspaper article that clearly indicated the amount of time, and ignored the fact that Dr. Beatty said, hey, if he worked more than 23 days, my opinion's going to change. And he did. What did the claimant tell Dr. Onn as far as the amount of time that he was involved in the pumpkin patch? He told Dr. Onn that it was a hobby and it was a short amount of time, and let me find the record here. Because it's, because he initially, he initially, well, he was also implying that he was supervising everybody and wasn't doing the work as well, which is another thing that he told Dr. Beatty, which was clearly untrue based on the testimony of his co-workers. What Dr. Onn's note stated on October 10th was patients here for follow-up evaluation of bilateral lateral epicondylitis, patient had IME done, and IME doctor agreed that patient had the condition. But, however, this is new information that came up that patient never informed me about, which is patient's farming activity, which apparently was quoted in the newspaper article as back-breaking work. When I asked the patient about the article, according to the patient, he has a small patch of farm, which is used to grow pumpkins. Even though his family owns a large acreage of farm, he always hires help to do the picking, and actually only four to six weeks out of the year the patient helps out a little bit, and the right elbow symptom predated the farming activity. He then goes on to ask him, he gives him a 25-pound lifting restriction then, and said he wants to see the article, and he asked the patient to produce the documentation that his elbow claim predated the farming activity. The only other note from Dr. Onn then comes on October 17th, stating, per Dr. Onn, he cannot dictate anything to help Mr. Rex in case. See news article in back of chart, advise patient of above. Patient wants to wait on work comp, or not just have the surgery. I also explained to the patient that he could have the surgery through his health insurance. He did not want to do so at this time, and then he transfers to Dr. Baker. I only really wanted to get to the four to six weeks. What did he testify to himself at the arbitration hearing? How much he worked. He testified that it was a hobby, and it was mostly supervisory, and it was the testimony of his co-workers that basically showed the amount of time and energy he was putting into the pumpkin farm, and it completely contradicted what he had said. So, but if it contradicted what he said, wasn't it for the commission to decide who was telling the truth? It's a credibility call. Well, to some extent it's a credibility call, but when you have one man who is obviously biased and trying to receive benefits for a worker's compensation case, and you have three co-workers, one of which was his brother, a newspaper reporter, all of which have no stake in this whatsoever. I mean, why would they have lied? I mean, to some extent it's a credibility, but it also goes to, you know, what is substantial support in the evidence? You know, the only thing supporting Mr. Rexing's claim is his own testimony and Dr. Baker. Well, he says that he harvests pumpkins one month a year, tries to get one or two loads of pumpkins each day, and he estimates that he harvests over a thousand pumpkins a year. That was his testimony. He told Dr. Ahn it was four to six weeks, so it's not inconsistent with his trial testimony, and the commission heard it all. Why can't they believe it? You say because there's one witness that doesn't say otherwise? Well, four to six weeks is certainly more than 23 days, which is what Dr. Beatty's opinion is. Well, he said one month in his own testimony. Yeah, in his own testimony it changes depending on who he's talking to. If you look at what he says to Gregory Northley, who was the reporter who wrote the newspaper article, it certainly was a lot more than what he testified to in front of the arbitrator. So his own testimony becomes a credibility issue when he says one thing to a newspaper and another to somebody who's going to award him benefits. Now, beyond that, the other evidence in this case clearly established that when he went for the IME with Dr. Nagolsky and then two months later with Dr. Beatty when he began treating him, he hadn't even been working as an APEX operator. He'd been driving a truck for six months. But he was completely symptomatic, and the only thing that could have been causing those symptoms was the pumpkin farm because he wasn't doing the APEX operator job. Now, if we're going to award him benefits for working as an APEX operator, you know, the first line to overcome the hurdle is going to be you were working the job. He wasn't. In this case, you know, he goes in, he's completely symptomatic, he now needs surgery, he hasn't been working the APEX job for four to six months depending on between Dr. Nagolsky and Dr. Beatty, and if you look at some of the rationale that the commission put in their decision as to why Dr. Beatty was more credible than Dr. Nagolsky, it makes no sense. I mean, it included Dr. Nagolsky didn't review Dr. Beatty's records. Well, Dr. Nagolsky saw him two months before Dr. Beatty. There weren't any records to see that at that point. Didn't Nagolsky also testify at a deposition later? Yes, he did. Couldn't he have looked at Beatty's record before the deposition? If they had been provided. But if your opinion is based on what you know at the time of your examination, which it was, there wouldn't have been those records. Another thing is they discredited Dr. Nagolsky's opinion because he didn't know the force that was required to do the APEX operator job. Neither did Dr. Beatty. I mean, you have to have some credible reason to have one physician's opinion outweigh another, and in this case, all of the bases that were provided by the commission are completely wrong. With regard to the commission's decision to award certain medical expenses, what is your position as to why the two surgeries performed by Dr. Beatty were unreasonable? The only reason that there is a question of reasonable necessity, because everybody agreed that this was his condition and the surgeries, you know, probably were what he needed, was how he came out of them. You know, a good result following a surgery is typically the best evidence that the surgery was reasonable and necessary, and in this case, he comes back and says, I still can't do this, I can't do that, I'm still in pain. So to some extent, that's where the reasonable necessity comes in with those. On the contrary, couldn't you also say, does the act limit recoverable medical expenses to surgeries or treatments that are successful? Is that the test? I'm sorry, I didn't catch the beginning of the question. Does the act limit recovery to surgeries or treatments that are successful? No, it does not. It does not at all. But like I said, the most obvious evidence to supporting a surgery is if there is a good result. The other issue that we had on appeal had to do with the mileage expenses that were awarded in this claim, and the standards set forth in general tire and rubber in 1991, it was an appellate court decision, and basically that case said that travel expenses should be awarded if it is reasonable and necessary. You're complaining about the travel expenses to see the surgeon? I'm sorry? You're complaining about the travel expenses to see the surgeon? For Dr. Beatty, that's correct. How many miles did he have to travel to see your IME? I'm probably sure it was close to 100 because the IME was in St. Louis. So it's okay for you to send him 100 miles for an IME, but it's not okay for him to go 100 miles for a surgery, just because there's somebody else in town that could perform the surgery? Well, if you look at the only reason why he didn't have the surgery performed in town, it's clear that the reason he didn't have Dr. On do it is because Dr. On didn't think that it was work-related. That's not true. He testified that their co-worker had been operated by Beatty, and he didn't leave any scars. But that begs the question. When you look at the fact that Dr. On was recommending the same surgery, told him he would do the surgery, and it's very clear in Dr. On. Why shouldn't the injured worker have a choice of what doctor he wants to operate? He does have a choice on who he wants to operate, but what you have to look at is the underlying reason to determine if it was reasonably necessary to travel to St. Louis for him to obtain the medical services. So I ask you the same question. Was it reasonably necessary for him to travel 100 miles to see your IME? You couldn't find an IME that was closer? Your Honor, it's a catch-22. Because if we have them examined locally, we are told that they are company doctors, and basically we are manipulating the system by having them see someone close. So if we send them to St. Louis. It isn't like this guy got off an airplane and went to India to get this work done. No, he did not go to India. No. The bottom line here is, is it reasonable and necessary for him to travel to see Dr. Beatty? And if you look at the general prior case, the original case, the guy had to go to Wood River to get the surgery because no one else was willing to perform the surgery. The commission has followed the general prior case and found that it was required for him, for some reason, to travel to get the services. Counsel, you have time on rebuttal. Thank you. Thank you, Your Honor. Counsel, please. May it please the Court, my name is Michael Meffer. I'm here on behalf of the employee in this case, Kenneth Rexen. I'd like to point out, since we ended on the mileage issue, I'll go ahead and continue with that. I would agree very much with what you said, Your Honor, regarding the Section 12 examinations. In fact, in this case, there were two Section 12 examinations which were conducted in St. Louis, which is actually further than Mr. Rexen traveled to treat with Dr. Beatty. This is an issue that has come before the commission on numerous occasions, as well as before this Court. Travel expenses, while it may be the smallest award in this case, is actually very important, and it may seem like a small issue, but it does go to the ability, as you mentioned previously, of the injured worker to choose the physician that they want to treat with. In this case, Mr. Rexen testified that he had observed the scars on co-workers who had had the same procedure done that he had, that he had observed patients who had treated with Dr. Beatty, and based on the recommendation, chose to treat with him. Mr. Beatty, like many other workers around the State of Illinois, lives in a relatively rural area where options of health care providers are limited. Options to treat with a specialist is limited. And in this case, Mr. Beatty did what was reasonable and customary in that area, in Mount Vernon, just like many other areas throughout the State, which is treat with a specialized doctor that's still within the local region in St. Louis. And the respondents, Continental Tire's own actions, show how reasonable that was, in that when a person in the Mount Vernon area selects a specialized practice to examine or to treat with, they go to St. Louis. Continental Tire did it twice in this case, with the examination with Dr. Pruitt, as well as the examination with Dr. Nagaus. Ken Rexen acted on the same customary and reasonable approach that any other person living in that area does, which is to treat with a specialized physician in St. Louis, or in Edwardsville, which is a suburb in Illinois. And there's clear evidence in the record that he wanted to do so to seek specialized treatment. When you first saw Dr. Nagauski or Dr. Beatty, how long had it been since he'd been working for a respondent? He had worked for a respondent for, I believe, approximately 11 years at that point. Was it actually about four months since he'd even been to work at the respondent's place? When he saw Dr. Nagauski, it's my understanding that he was on light duty at that point. He did have, which I don't believe is disputed in this case, a chronic case of epicondylitis, which was not likely to resolve without surgical intervention. It's my understanding that's not in dispute as far as his condition. And whether it was symptomatic at other times or not, it continued to be symptomatic as he remained on light duty. Well, Mr. Intervalli has made the argument that at the time when he saw Drs. Beatty and Nagauski, it was about four to six months since he'd been working as the APEX operator, and he was only working at the pumpkin farm. Well, I think that the evidence in the record and the evidence that was presented at arbitration shows that the times that he was injured and reported injuries at the plant, he was not, in fact, working. In fact, his injuries were in December, June, and July, and he testified at arbitration that he is never working, picking pumpkins or otherwise, at his pumpkin farm during that time. So you're saying it's a question of credibility for the commission? Would that be part of your argument? I would certainly agree with that, Your Honor. I believe the commission at arbitration and at the commission level heard testimony of Mr. Rexine and that of his treating physicians and their opinion on causation and chose the opinion of Dr. Beatty. In addition to the fact that Dr. Beatty took a very thorough history and actually asked, and this is important, actually asked Mr. Rexine what he does in his job at the pumpkin farm, Dr. Nagauski did not ask. In fact, he testified at his deposition that he relied solely on the articles provided to him by Continental Tire. He knew about this pumpkin patch, but didn't bother to ask Mr. Rexine what he actually did. And if you look at the credibility and who has more knowledge of what's more likely to cause an injury, it's important that a physician takes the time to get a thorough history. Dr. Beatty, in addition to the history provided to him by Mr. Rexine, had also actually visited Continental Tire's plant and had knowledge of the types of jobs that were performed there. He was very well qualified to give the causation opinion, and I think that that's exactly right. That is a credibility question, and the Commission chose, rightfully so, to go with the opinion of Dr. Beatty. And it's well-established law that that is well within the purview of the Commission to make judgments on credibility, especially in the cases where medical testimony is disputed regarding causation. In the case of, and I'm going to say this incorrectly, Dietzenko, the Supreme Court ruled that it's within the purview of the Commission to decide which medical testimony is to be accepted where causation is disputed. And again, I would remind this Court that the standard of review for all issues, and I know I'm kind of going in reverse here, is manifest way to the evidence. And whether or not there is evidence in the record to support the decision of the Commission, which was confirmed by the Circuit Court. And clearly there is, and there are places where Mr. Trebia has claimed that there is undisputed evidence. For example, that Mr. Rexing's symptoms predated his pumpkin farm. Well, if you look in the record, Continental Tire's own accident report states that his symptoms predated the year 2000 when his very small pumpkin patch began. It was a quarter of an acre. Their incident report states that he had, in 2002 for his first injury, states that his symptoms had occurred for over three years, off and on. That's before he started doing anything related to a pumpkin farm. In addition, the history he provided to Dr. Beatty and Dr. Beatty's testimony at deposition confirmed that his symptoms predated the pumpkin farm. And I think it is, Continental Tire has tried very hard to make this case about pumpkin farm. And we're here three days after Halloween, and it's kind of ironic that we're talking about pumpkins. But as you know, after Halloween, what is a pumpkin? There's nothing. Pumpkins are done. You know, you can't sell a pumpkin after Halloween. That's what they're all used for. And Continental Tire has tried from the very beginning. Did you take additional notice of that fact, that you can't sell a pumpkin after Halloween? I'm sorry. No. Have we forgotten Thanksgiving? Oh, I guess. Well, I apologize then. There is pumpkin farms. But there is actually testimony from some of the coworkers and from Mr. Rexon that the primary pumpkin selling season concludes after Halloween. But getting back to my argument, Continental Tire has tried very hard. They sent articles to their examining physician about this pumpkin farm. And what has been lost in this is a very heavy industrial job that Mr. Rexon performed for eight years. And he worked at Continental Tire for 14 years prior to arbitration. And this was, and he testified to the amount of squeezing and forceful gripping he did to splice pads of rubber and hand stitch them together in this tire factory. And this was a very intense, repetitive job. And this is what Dr. Beatty had knowledge of by visiting the plant. And he had knowledge from the verbal history given to him and the conversations he had with his patient. And that, in effect, is what this case is about. It's not about pumpkin farming. It's about the job that he did and the contributions that it made and caused him to have this epicondylitis and required surgeries. Again, I would agree that this is an issue of credibility. It's within the purview of the commission to decide. It's my understanding that Continental Tire's arguments regarding the medical expenses and the temporary total disability benefits are related to the causation issue only. So I'll make no separate address of that issue. And again, I would ask the commission regarding travel expenses. Actually, I would ask this court. This is an issue that comes up quite often in front of the commission. And I would ask some guidance. I think it's important for workers that are situated much like Mr. Rexon. It's important to allow them to make the same choices that any other person throughout the state would reasonably make to obtain their medical treatment from a specialized physician. What about the argument of the reasonableness and necessity of the operation itself? You have a condition. He has a condition. He's symptomatic. Yes. But apparently the outcome is negative. Well, I think, as pointed out previously, there is no requirement that a surgery be successful in order for it to be reasonable. And Dr. Baty testified it was reasonable and necessary. And Mr. Rexon did testify that his condition did improve somewhat. He was not back to 100 percent, and that's not an unusual outcome for surgery. Even a successfully performed surgery, not all surgeries are going to have 100 percent results that are satisfactory. I'm sorry. Does that answer your question? Well, I guess what I'm saying is that, you know, there are many therapies that are out there available for different conditions, some of them traditional, some of them alternative medicine therapies. So is that where reasonableness and the necessity of treatment comes in? Well, I think, I mean, the opponent is saying, you know, it's true, the outcome may not be determinative, but we have an independent evaluation of what is reasonable and necessary by the commission. They have that obligation. And I think the commission did determine that this surgery was reasonable and necessary, and I think they based that on the opinions of the treating physician, Dr. Baty, as well as the fact that Mr. Rexon had treated for several years prior to having these surgeries done. He had tried very, an extensive amount of conservative treatment and other therapy modalities before surgery was performed in this case. And I think that would also speak to the reasonableness of the surgery, in that it was sort of the, that it was used only after more conservative treatments were exhausted. Thank you, counsel. Rebecca, please. Your Honor, counsel has requested that this court affirm the decision based on very heavy industrial job at Continental Tire, that Mr. Rexon wasn't working. If you look at his medical treatment record, there were conservative measures that were employed, and he was fine. And if you look at when he had his flare-ups, all of his flare-ups were during the season from May to October, whether or not he was working the apex job. If you look at his initial treatment, the first one from the December 2002, he was fine by February, which means the only thing he was doing at that time was the apex operator job. So instead of him becoming more symptomatic, he became less symptomatic. And when he's in the pumpkin farm, he becomes more symptomatic. It makes no sense. I have a question. If he's even very slightly symptomatic with this condition while he's working at the factory, would that be compensable? Not if it wasn't caused by the job. But let's say he's not. He's away from the pumpkin patch in October. He's working from the end of October through February, and he's symptomatic. The only thing he's doing is working the apex. Then his symptoms, if it was his job, wouldn't be diminishing during that time, and that's exactly what happened. Is it the fact they exist, whether they've diminished or not, if they exist in any quantum, would it be compensable? Not as far as I'm concerned, because it comes down to causal connection as to, A, what is causing the condition, and, B, what is aggravating the condition. The evidence in this case does not support that it was caused by the job. And you can't say it was aggravated by the job when the evidence clearly shows that he doesn't, that the symptoms actually get better while he's working the apex job as opposed to the other side. So you don't have an aggravation if the symptomology is getting better. Now, if in your scenario he worked all this and he kept getting worse during this time period, absolutely. Then that would probably be compensable. What if we had a medical record back before this pumpkin patch was ever created, that he was having symptoms of this condition and the only thing he was doing was working for the employer? Then I would think it would be compensable. But in this case, that's not what we have. In fact, when he talked about that he testified or said that it happened in 1999, the petitioner specifically went to Dr. Beatty and said, my symptoms began in December of 2002. He went in and told it. That's why this is a credibility issue. Because depending on who Mr. Rexing is talking to, depends on how this case ends. And you can't say one thing to, you can't ignore something written down. Because it's no longer beneficial to you. And that's exactly what the commission did here. They want to hang their hat on Dr. Beatty and his knowledge of the plant. He didn't have any idea what the guy was doing in the job. He didn't know how long he had worked it. He'd never seen the machine. You know, I've been to Continental Tire too. I've never seen it. That doesn't make me an expert. But what you have to look at is the evidence in this case does not support a finding that his condition was caused or aggravated by his job at General Tire, but was caused by his pumpkin patch. And so we're asking you to vacate the findings. Thank you, counsel. The clerk will take the matter under advisory.